## JAPAN TEA COMPANY v. FRANKLIN MacVEAGH & COMPANY.[1]

March 28, 1919.

No. 21,108.

**Authority of traveling salesman for wholesale house.**

1. The authority delegated to a traveling salesman, or drummer, for a wholesale mercantile house is, as a rule, limited to soliciting and transmitting orders to his principal for acceptance.

**Same — authority to make sales.**

2. Plaintiff's evidence conclusively negatives authority in the defendant's traveling salesman, who solicited and transmitted an order for merchandise, to consummate a sale thereof, it appearing that the order was promptly rejected by defendant. Such evidence is also *held* to establish that a general custom in the mercantile business restricts the authority of traveling salesmen to soliciting orders merely and not to make sales, of which custom plaintiff must be charged with knowledge; and further that such writings from defendant as might have come to plaintiff's notice could not have induced a belief in plaintiff that the salesman was invested with authority to make an absolute sale of the goods described in the order.

Action in the district court for Ramsey county to recover $705 for breach of contract. The answer was a general denial. The case was

1 Reported in 171 N. W. 305.

tried before Haupt, J., who at the close of plaintiff's testimony denied defendant's motion for a directed verdict, and a jury which returned a verdict for $505.85. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Reversed.

*Dodge & Webber* and *Brown & Slade,* for appellant.

*Joel E. Gregory,* for respondent.

HOLT, J.

Plaintiff conducts retail tea and coffee stores in St. Paul and Minneapolis; defendant deals in the same commodities by wholesale at Chicago, Illinois. It employes traveling salesmen or drummers, one of whom, on January 17, 1917, solicited and obtained from plaintiff an order for 15 chests of tea at 28 cents per pound, and on March 3, 1917, another order for 50 chests at 29½ cents per pound. Defendant rejected the orders by prompt notice to plaintiff. By letter dated April 10 plaintiff demanded a delivery, which being refused this action was brought, on the theory that the placing of the orders consummated sales of the tea therein specified. The court below held the first transaction not a sale, but permitted the jury to determine whether the one of March 3 amounted to a binding contract. The verdict was for plaintiff and defendant appeals.

Plaintiff and defendant are corporations. Mr. Anderson, plaintiff's president, represented it in giving the orders to Mr. Furlong, defendant's traveling salesman. Mr. Watts was defendant's general manager. In holding the transaction of January 17 not an enforceable contract, the learned trial court applied the well settled rule that a traveling salesman for a wholesale mercantile establishment is not presumed to be invested with authority to make an absolute contract of sale, his ostensible power and duty being limited to soliciting and transmitting orders for his employer's acceptance. 2 C. J. 593; 6 Am. & Eng. Enc. (2d ed.) 227. Mechem, Agency, § 75, and authorities cited under section 861.

The question raised by this appeal is whether the rule was applicable

also to the order of March 3. If so, defendant should have prevailed. The order is in the following words:

Franklin MacVeagh & Co.,                              March 3d, 1917.
          Chicago.
  Dear Mr. Watts:
  Please enter Japan Tea Co., St. Paul, Minn.
  50 chests F. M. V. 200 a 292 F. O. B. Minn.
  To be taken out all at one time on or before July 1st, 1917.
  Same tea as before shipped them.
                                            Paul I. Furlong.

There was no part payment or part delivery, so that the transaction, involving goods priced at more than $50, comes within our statute of frauds. Defendant asserts that the order signed by Furlong is not a sufficient memorandum of sale to comply with the statute. But we need not determine the question now, for we are of the opinion that the evidence does not warrant a finding of authority in Furlong to consummate a sale.

Under the rule above stated it was incumbent on plaintiff to show special authority in Furlong, and plaintiff called him as its chief witness. Upon his testimony alone and certain letters, hereinafter noted, all claim to authority in Furlong to close a sale must rest, for there was no other evidence of any delegation of power beyond that which ordinarily pertains to the employment of a traveling salesman. When the order of March 3 was taken, Mr. Anderson already had actual knowledge that Furlong's authority was restricted to the soliciting orders merely, for he had received notice of the rejection of the previous order. Furlong had left defendant's employ some time before the trial, and it cannot well be claimed that as a witness he exhibited any disposition to favor his late employer. While in some parts of his testimony he made broad assertion of authority to make a sale, yet his further examination reveals that he used the term as synonymous with taking orders, for on cross-examination he freely admitted that the orders he took, including the one now in question, were not absolute sales, unless accepted by defendant. And even on direct examination he said: "I knew all my or-

ders were subject that way, all orders I took were subject to the house's approval; some I got through and some I didn't; I treated that order (the order of March 3rd) just like any other order." Furlong's testimony proved lack of actual authority to conclude a sale.

Furthermore, this witness also established that the ordinary business custom repels the inference that a traveling salesman is invested with general power to make absolute sales. He was asked: "Do you know the steps and proceedings incident to a sale by a traveling salesman in the ordinary course of business?" He answered in the affirmative, and, when asked what steps, said: "The orders are taken by the salesmen and sent to the house. The first thing they do they pass on the credits. If the credits are O. K. then it is passed on to the stockman and if the stock is on hand it is O. K.'d by them, and then it is passed up to the manager of the department, and if the other proceedings are O. K.'d, they O. K. it and then it is shipped." He further stated this to be the universal custom all over the country. Being such a custom plaintiff was chargeable with notice thereof, and must therefore rely upon some tangible proof of special authority to make a sale such as the memorandum purports to evidence.

It may be confidently asserted that the record is barren of any verbal directions to make the claimed sale. While Mr. Furlong speaks of an interview with Mr. Watts in December, it is clear that he claims nothing special thereunder so far as the transaction of March 3 is concerned. At times in his testimony Mr. Furlong suggests other letters from Mr. Watts than those set out below, but when he is cross-examined it becomes apparent that no others were received by him or by plaintiff from defendant, upon which special authority could be predicated. And, even if there were others, there was no sufficient proof of the contents, so that an inference of special authority could be drawn therefrom.

As to these letters received in evidence, we have first one from Watts to Furlong, dated January 3, 1917, in which the price (presumably 29½ cents per pound) was left open on F. M. V.—200 tea until after January 16, "as you suggest, for the Japan Tea Co.; but I shall have to limit you to 50 half chests to be taken out on or before April 1st."

On January 17 an order for 15 chests at 28 cents a pound was obtained by Furlong from plaintiff. Watts acknowledged to plaintiff the

receipt of this order by letter, dated January 26, but refused to accept it, and further stated: "We are mailing you under separate cover a sample of Ceylon marked Duckwari No. 2, that we will be willing to deliver at the price named, or we will deliver in order to protect you the same tea as shipped last at 29½. This I am confident you will consider more than fair under present conditions. We await your early reply." There was no reply.

On January 23 Furlong wrote Watts that he had told Anderson he would be advised if the order of the 17th was not accepted, and suggested to Watts that further efforts to do business with plaintiff be abandoned. Watts answered under date of January 29 saying: "I have your favor of the 23rd. While it is not possible to make a large profit on such concerns as the Japan Tea Company, it is worth while calling on them, as they buy in large quantities and very often you can make a fair profit on them. I know that you are not fond of this man Anderson personally. I would not let this stand in my way of calling on him and doing business. You cannot make money being away from him—you can by staying with him. I am writing Mr. Anderson a letter today of which I will enclose you a copy. I am of the opinion that we can straighten Mr. Anderson out." The copy of the letter to Anderson was evidently of the one of January 26 above referred to.

On February 16 Furlong wrote Watts: "What came of this? Did he reply? I bet he didn't—not his style." This undoubtedly referred to the proposition in Watt's letter of the twenty-sixth of January to Anderson. Watts replied thus to Furlong's inquiry: "You are right, he did not answer. He must be a dummy for sure. Drop in on him and let me know what he says. I would get out of filling if you can as there would not be much of a profit in it." This last sentence we think should be taken as a withdrawal of the offer of January 26 to "protect" plaintiff, that is, to let him have 15 chests at 29½. It surely does not indicate the granting of any special authority beyond that possessed by Furlong as a traveling salesman to solicit orders merely; it is rather a positive prohibition against even soliciting such an order as that of March 3. There is testimony that some of the letters from Watts to Furlong were shown to Anderson just prior to March 3, but from none of these would Anderson be warranted in drawing any inference of authority in

Furlong to even solicit such an order as the one of March 3, much less to close a sale. Nowhere is found the slightest hint of extending the time of delivery to July 1. The letter of January 3 expressly limited the time to April 1.

Appellant also insists that the order taken was contrary to the direction of last mentioned letter, in that it was for twice the quantity authorized. But respondent contends that half chests and chests of tea mean the same quantity in the trade. The record is silent on the subject. However, on turning to the word "tea-chest" in the Century Dictionary, we find it defined in part as "a box containing a definite and prescribed amount of tea, otherwise called whole chest (a hundred weight to 140 pounds or more), now seldom shipped, the smaller package being spoken of as half chest (75 to 80 pounds, but the weight varies according to the kind of tea) and quarter chest (from 25 to 30 pounds)." It may therefore be conceded, for the purpose of this decision, that a chest of tea, in the language of the trade, is understood to be a half chest and not a whole chest. That notwithstanding, we think the order is in disregard of the authorization given Furlong on January 3 both as to the time limit for soliciting it, and the time of delivery of the tea, and that neither the subsequent correspondence, nor any part thereof that may have come to plaintiff's notice, could have induced a belief that Furlong had authority to conclude a sale such as would be evidenced by the order of March 3.

Defendant was entitled to an instructed verdict as requested by it.

Order reversed.